STATE, Use of James Leo Elder, et al.,

*vs.*

BALTIMORE & OHIO RAILROAD COMPANY,

*Lord Campbell's Act: pecuniary interest of equitable plaintiffs; mere occasional gifts from parent, not sufficient.*

There can be no recovery of damages under Article 67 of the Code but for claims for pecuniary loss, actual or expected, suffered by persons described in the statute.          p. 502

The right to maintain the action is based on the pecuniary interest of the plaintiffs in the life of the person killed.  p. 502

To entitle adult children to recover under that Act for the death of their father, through the negligence of the defendant, proof of occasional gifts of small value to them by the father does not show such a pecuniary interest as to enable them to maintain an action, under the statute, for damages for his death.                    p. 504

Neither does the fact that an adult son received small wages for helping the father work their farm constitute such an interest as to enable him to maintain such a suit.          p. 505

*Decided June 24th, 1915.*

Appeal from the Circuit Court for Montgomery County. (PETER and WORTHINGTON, JJ.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Paul Y. Waters* and *George P. Hoover,* for the appellant.

*Francis Neal Parke* (with whom was *Jas. A. C. Bond* on the brief), for the appellee.

PATTISON, J., delivered the opinion of the Court.

In this case an action was brought, under Article 67 of the Code of Public General Laws of this State, by the appellants, to recover damages for the death of their father, James M. Elder, resulting from the alleged negligence of the appellee company.

The said James M. Elder, while upon a public highway, attempted to drive his horse, to which was attached the carriage in which he was riding, across the tracks of the defendant company at Derwood, a station upon the defendant's road between Baltimore and Washington, and was struck and instantly killed by an engine or train of the defendant company. The plaintiffs, consisting of three daughters and one son, instituted suit in Montgomery County to recover the sum of twenty-five thousand dollars as damages alleged to have been sustained by them as a result of his death. The case proceeded to trial in that Court before a jury, and at the conclusion of the plaintiff's testimony an instruction was granted by the Court directing a verdict for the defendant because of a want of legally sufficient evidence entitling the plaintiffs to recover, the Court holding, as it was stated in the argument, that there was no legally sufficient evidence to be submitted to the jury tending to show any damage sustained by the plaintiffs by reason of their father's death.

The record discloses that all three of the daughters were married and living apart from their father at the time of his death. Mrs. Wightman, wife of Frank Wightman, an engineer on the B. & O. R. R., lived at Brunswick, Frederick County, Maryland; Mrs. Crawford, with her husband, a farmer, lived in Montgomery County, and Mrs. Welch, wife of John B. Welch, also a farmer, lived near the home of her father in the last-named county. The son, James Leo Elder, the youngest child, twenty-three years of age at the time of the death of his father, lived at home with him. The deceased at the time of his death was living on the farm of his said children, consisting of about one hundred and forty-eight acres. In addition to the one upon which he lived he rented and cultivated another farm, containing about one hundred and forty or one hundred and fifty acres. He was at the time of his death a widower, his wife having predeceased him some twenty-one or more years.

It was shown by the evidence offered by the plaintiffs that the father gave to each of his daughters each year a sow or two shoats, these were given "at killing time." The value of a sow, such as he gave them, was said to be about fifteen or twenty dollars, and the value of the shoats about ten or fifteen dollars a pair; and he usually gave to each of them a turkey, but never gave them any money. The son, who lived with him and worked for him on the farms, received from the father two hundred dollars a year, and at times, as the son testified, his father would give him, when he asked for it, five or ten dollars. Welch, the son-in-law, in speaking of what was received by the son, said "he," meaning the father, "gave the son a couple hundred dollars a year and a horse and buggy." Upon cross-examination he testified that the son worked at home with his father, had always lived there during his life, and that the "father paid him $200 a year for working on the farm;" he thinks he gave him the horse and buggy before he was twenty-one. This witness also said that Mr. Elder gave to his daughter, witness' wife, a cow about two years before his death.

Mrs. Crawford, who had been married fourteen years, and during which time she had lived apart from her father, testified that during the last two or three years of her father's life he gave her presents; he gave her two shoats every year, the two were worth about ten dollars, and then he also gave her a turkey, and when he would visit her he would bring with him "different things at different times," but he had not given her money; that "he has carried her to places and spent money on her." She afterwards stated, however, that the "places" to which she referred consisted of one trip to Virginia; that the trip was made in a two-horse hack, as she called it, and her brother and sister went with them; she did not recall any other occasion that she ever made any visits or trips with her father.

James Leo Elder, the son, testified that he was twenty-four years old in February before the trial; that he had always lived with his father, about two miles from Derwood. When asked, "Did your father ever make you presents or contributions of anything valuable during the last two or three years of his life?" he replied, "Yes, he gave me money. Gave me a five and ten dollar note any time and $200 a year. He did not pay me any money, but just give it to me." That he had also given him a horse and buggy and cows and calves. On cross-examination he was asked, "You say your father gave you $200 a year?" A. "Yes." Q. "Was the $200 your wages?" A. "No, sir." Q. "How did he happen to fix on $200?" A. "Well, he naturally gave me $200, and any time I wanted money he would give me five or ten dollars." Q. "He never gave you more than $200?" A. "Yes." Q. "When did he give you more than $200?" A. "Any time he would give me $5 or $10." Q. "Did you do ordinary farm work around the place" A. "Yes." Q. "Did he pay you any wages?" A. "No, sir; never did." He further testified that his father had been giving him $200 a year for four or five years, and that since arriving at majority he and his father have been "working together, farming

together;" they didn't run the farm together; witness' father rented the farm. He never gave witness any wages; witness never kept any account of how much his father actually gave him, but just estimated it. He gave witness $200 and gave him $5 or $10 when he wanted it, and witness estimated it at $200. In some years the $200 would be given to him in the fall, and in other years at other times; sometimes it would not all be paid him at one time, but during the year. He was then asked, "You mean to say that during the year he gave you $200, off and on, $5 or $10 any time?" A. "No, sir." And then being asked by the Court to explain to the jury what he meant, he stated, "He gave me $100 now and may be in four or five months another $100, and that would be $200, and $5 or $10 whenever I would want it." He would give me $5 or $10 about every two months, any time witness wanted it. Upon re-cross-examination witness stated that he did not make a full hand on the place all the time; when they were busy he would work hard and when they were not busy he would not do much; he would harvest and cut corn; had it easy all right; that a hand doing kind of work witness was doing for his father would get about $10 a month and his board; his father boarded him. He made no contract with his father about wages after becoming of age, but kept on going like he always did.

The record discloses an admission on the part of the plaintiffs that the title records in the office of the clerk of the Circuit Court show that the farm on which Mr. Elder lived belonged to his children.

The sections of the article under which this suit was brought are almost a literal transcript of the English Statute, 9th and 10th *Victoria*, Chap. 93, known as Lord Campbell's Act; one difference being that under the English Statute the suit must be brought by the executor or administrator of the deceased for the use of the parties mentioned, while under our statute the suit is brought by and in the name of the State for the use of such parties. Under both statutes the action is brought for "the benefit of the wife, husband, parent and

child" of the person whose death is caused by the wrongful act, neglect or default of the defendant.

In the English courts the construction of this statute has been the subject of careful consideration in several cases, and the courts in those cases have uniformly held that the damages in such cases must be confined to the *pecuniary loss,* and the jury should not be allowed to take into consideration the pain and suffering of the deceased, or the mental suffering of the party for whose use the action is brought: *Dalton* v. *S. E. Ry. Co.,* 4 C. B. (N. S.) 296; *Franklin* v. *S. E. Ry. Co.,* 3 H. & N. 211; *Pym* v. *G. N. Ry. Co.,* 2 B. & S. 759. And this Court has uniformly adopted this construction of the statute: *State, use of Coughlan,* v. *B. & O. R. R. Co.,* 24 Md. 85; *B. & O. R. R. Co.* v. *State, use of Hauer,* 60 Md. 449; *B. & O. R. R. Co.* v. *Mahone,* 63 Md. 135; *Agricultural & Mechanical Assn.* v. *State, use of Carty,* 71 Md. 86.

It is well settled that the claim for damages in all such cases must be founded on the pecuniary loss, actual or expected, suffered by the persons described in the statute. The right to maintain the action is therefore based on the pecuniary interest of the plaintiff in the life of the person killed, and the value of such interest is the measure by which damages are to be allowed. *B. & O. R. R. Co.* v. *Mahone, supra.*

There have been many cases before this Court where the equitable plaintiffs were parent, husband, wife or minor children, but there have been only a few cases before it where the equitable plaintiffs were adult childrn.

The cases to which our attention has been specially called are those of the *B. & O. R. R. Co. v. Hauer,* and *B. & O. R. R. Co.* v. *Mahone.* JUDGE MILLER, who sat in those cases, in discussing the decisions rendered in them, said in the opinion of this Court delivered by him in the case of *Agricultural & Mechanical Assn.* v. *State, use of Carty, supra,* that in the case of *B. & O. R. R. Co.* v. *Hauer,* "A father was killed who had two adult unmarried daughters who lived

with him as part of his family, were dependent upon him for support by reason of their inability to support themselves, and their father had supported and was supporting them at the time of his death. In view of these facts, the Court allowed the jury to award damages to these adults as well as to the minor children. Following in the same line is the case of *B. & O. R. R. Co.* v. *State, use of Mahone,* 63 Md. 135. The person killed was a mother who made her permanent home with a married daughter, to whom she rendered services by attending to housework and looking after the children while the daugther was away at work, and thus gave her considerable assistance, which she had rendered and was rendering when she was killed. The Court allowed the jury to consider the pecuniary value of these services to the daughter and to award her damages for the loss of them."

*Mr. Poe,* in his work upon *Pleading and Practice,* 3rd ed. vol. 1, sec. 464, in discussing this question, says: "Where adult children are dependent upon their father for support, they may recover for the loss sustained by them by his death," and in his note thereto quotes fully from the *Hauer case.*

To enable the plaintiffs to maintain this action it was incumbent upon them to show that they had in the life of their father a pecuniary interest, which they could have reasonably expected to continue so long as he lived and which was lost to them by his death, caused by the negligence of the defendant.

It is because of these alleged gifts from the father to the daughters, and upon the reasonable expectation of their continuance so long as he lived, that they claim a pecuniary interest in the life of the father, of which they were deprived by his death.

The three daughters who are plaintiffs in this case were married a number of years prior to the death of the father, and during their married life had lived apart from him. They were not in any sense dependent upon the father for support or maintenance, but were living with, and we may

assume from the evidence were cared for and supported by
their respective husbands. The alleged occasional gifts made
by him to them do not, we think, under the facts and circum-
stances of the case, show that the daughters had, in the life
of the father, such a pecuniary interest as will enable them
to maintain this action.

The pecuniary benefit or interest claimed by the son in
the life of the father consists of the payment to him by his
father of five or ten dollars at irregular intervals, whenever
he would ask for it, in addition to the two hundred dollars
paid to him every year.

The son, who at the time of his father's death was twenty-
three years of age, had for a number of years worked upon
his father's farm in the cultivation and harvesting of the
crops, and was so working at the time of the death of his
father. He, as shown by his testimony, carefully avoided
stating the object or purpose for which the money received
from his father was paid to him. In this connection he says
that he and his father had been "working together, farming
together," although they did not "run the farm together;
the father rented the farm"; and when asked if he received
any wages he said "No," and when further asked why and
for what purpose he was paid two hundred dollars, he replied
by saying: "He naturally gave me $200," and assigned no
reason therefor.

It is hard to believe from this testimony that the son
"worked and farmed" with his father in the cultivation of
the two farms and was paid nothing in consideration there-
for, and that his father gave to him a fixed and definite sum
of two hundred dollars each year with no stated object or pur-
pose in so doing. And the explanation of the son that he
"naturally" give it is not at all satisfactory. The evidence,
we think, when properly considered, discloses that the said
sum of two hundred dollars received by him from his father,
was paid to him in consideration of the work performed by
him for and on behalf of the father, although the son may
not have regarded or looked upon it as paid to him as

"wages." And this conclusion is in accord with the direct and positive testimony of Welch, who stated that "his father paid him two hundred dollars a year for working on the farm." Therefore, as the money was paid to him for work so done by him under an agreement with the father, he can not maintain this action for the loss of any pecuniary benefit accruing to him therefrom, caused by the death of the father. *Poe's Pleading and Practice,* Vol. 1, sec. 464; *Sykes* v. *N. E. Ry. Co.,* 44 L. J. C. P. 191.

Nor can the alleged occasional gifts from the father to the son, under all the facts and circumstances of the case, be regarded as giving to him such a pecuniary interest in the life of the father as will enable him to maintain this action, when it is considered that at the time of the death of his father he was twenty-three years of age, and was supporting and maintaining himself by his own labor, although employed upon his father's farm, and living at home with him.

There is no proof in this case that the plaintiffs had any pecuniary interest in the life of their father, entitling them to maintain this action.

From what we have said it follows that the judgment of the Court below should be affirmed.

*Judgment affirmed, with costs to the appellee.*